# ROBERT J. MATTILA v. OLIVER IRON MINING COMPANY.[1]

February 2, 1951.

No. 35,347.

[1]Reported in 46 N. W. (2d) 82.

*W. O. Bissonett,* for relator.
*James Pomush,* for respondent.

THOMAS GALLAGHER, JUSTICE.

Certiorari to review an order of the industrial commission made on June 30, 1950, awarding employe compensation for temporary total disability, and for his medical and surgical expenses.

Relator (the employer) asserts (1) that the injuries for which compensation was awarded were not the result of an accident arising out of and in the course of his employment; and (2) that the medical, surgical, and hospital expenses for which compensation was awarded were incurred by employe without employer's knowledge or consent and without an order of the commission, and that hence employer is not liable therefor.

On May 25, 1945, while employed by relator at its Sibley mine near Ely, employe was engaged in pulling a heavy piece of timber

with a "come-along," a device with a wooden handle on each end and a pair of tongs in the center, used for dragging timber along the ground. While thus engaged, the "come-along" slipped out from the timber, and employe fell backward five or six feet onto an uneven pile of logs, striking his back and shoulder on the sharp edges thereof. He testified that as the result of the fall his back immediately commenced to pain all over and hurt him so much that he thought it was broken; that he lay on the timber at least 10 minutes before he could move and then got up and resumed work, but that the pain in his back continued thereafter.

On the same date he reported the accident to his foreman. At the latter's direction, on the following day he went to the Shipman Hospital for examination and treatment by doctors there, operating under a contract with employer under which they were to furnish medical, hospital, and surgical services for all of employer's compensation cases at a fixed annual fee. X rays were taken, and one of the doctors, after feeling employe's back and examining the X ray, informed employe that the extent of his injuries appeared to be a bruise on his back some place around the ribs; and that the X ray did not disclose anything further.

Employe then resumed work for employer for approximately a month. At that time, again experiencing pain, he returned to Shipman Hospital, although it does not appear with whom he then consulted or what treatment was given him. Thereafter he again resumed his employment and continued therein for another month. The pain then left him completely so that he was able to continue work for approximately five or six months thereafter. At that time he again began to experience pain in his back, which he described as between the hips near the lower part of his spine. He returned to Shipman Hospital and was again examined by one of the doctors there, whose name does not appear. His back was taped, and he again resumed his employment and continued therein for another five or six months, when the pain in his back again returned. He then made another trip to the hospital for treatment, but thereafter had recurrent pains in his back about every six months.

On March 21, 1947, still suffering pains in the lower part of his back, he called upon a doctor of his own choice, Omer E. Snyker of Ely. The latter immediately "was impressed with the possibility of a spinal injury." He strapped employe's back and advised him of its proper use in working and lifting. He testified that his later physical findings, which disclosed radiation of pain in employe's leg and nerve muscles, confirmed his earlier diagnosis of possible spinal injury. He asked employe if he had sustained any accident, and was told of the fall which occurred on May 25, 1945.

Dr. Snyker then recommended a spinogram X ray and referred employe to Dr. Vernon D. E. Smith of St. Paul for such purpose. Before acting on this advice, however, employe endeavored to obtain relief from a local chiropractor. Unsuccessful in this, he returned to Dr. Snyker and on August 23, 1948, journeyed to St. Paul for the spinogram X ray recommended by the latter. This was taken at Miller Hospital under the direction of Dr. Smith, who also made a physical examination of employe. Based on the spinogram and the physical examination, Dr. Smith concluded that employe was suffering from a herniated intravertebral disc pressing directly on the corresponding lumbar nerve, and that the disc had already ruptured. On August 27, 1948, he performed an operation on employe's back, removing segments of the perforated disc therefrom, following which employe made an uneventful recovery.

Dr. Smith testified that the fall which employe sustained on May 25, 1945, was, in his opinion, the cause of the ruptured disc for which he was treated and operated upon. Dr. Snyker testified likewise. Dr. Smith gave further testimony that many people experience disc injuries of this kind from a fall such as was disclosed by employe; that ordinary X rays are usually negative insofar as this type of injury is concerned, which was the reason for requiring a spinogram X ray; that when the pain is due to a disc it may be temporarily relieved when the disc slips back into normal condition; that when the disc cannot resume its normal position the pain becomes constant; and that sometimes it is a matter of months before the

disc gets out of position far enough to cause pressure sufficient to extend the pain to the leg of the injured person.

We believe that the evidence is amply sufficient to sustain the findings of the industrial commission that employe's injuries were due to the fall he sustained May 25, 1945. No evidence was presented that he had sustained any other injury or accident. Employer asserts that the failure of employe's physicians' records to disclose that employe had complained of any pain in the lower part of his back when first examined was conclusive that his injury was not the result of his fall on May 25, 1945. Employer's physician testified, however, that his report was not a detailed report, but merely a skeleton outline used when a patient first came in. On cross-examination he definitely recalled that employe, when first examined, had advised him that he was injured so badly that he was unable to get up for 10 minutes after the accident, and he admitted that this statement was not inserted in his report.

Employe testified that after his fall his back felt like it was broken and hurt him so much that he did not want his fellow employe to touch him; that employer's doctor informed him after examination that he had sustained a bruise on his back, but employe did not remember where the spot was. He described the recurrent pains in his back and located them in the sacroiliac region thereof. He further testified that he had advised the doctors at Shipman Hospital of the location of the pain in the lower part of his back, and was told by them that there was a "suspicious looking spot on one of the ribs," but that they did nothing about it.

The medical testimony submitted on behalf of employe is undisputed. There is no testimony whatsoever presented that this disc was not caused by the accident of May 25, 1945. As stated many times by this court, the triers of fact must accept as true the positive, unimpeached testimony of credible witnesses unless it is inherently improbable. We do not find it to be improbable here. On the contrary, the conclusion seems inescapable that the fall sustained on May 25, 1945, was a direct cause of employe's injuries for which this claim is made. See, Haller v. Northern Pump Co. 214

Minn. 404, 8 N. W. (2d) 464; Paul v. Thornton Brothers Co. 206 Minn. 74, 287 N. W. 856.

■ It is employer's contention that under M. S. A. 176.15 employe was not authorized to change physicians without the consent of the industrial commission, and that hence it is not liable for the additional expenses thus incurred by employe in effecting his cure. Section 176.15 provides:

"The employer shall furnish such medical, surgical, and hospital treatment, * * * as may reasonably be required at the time of the injury, and during the disability, to cure and relieve from the effects of the injury. *In case of his inability or refusal seasonably to do so* the employer shall be liable for the reasonable expense incurred by or on behalf of the employee in providing the same. * * *

"The commission may *at any time,* upon the request of an employee or employer, order a change of physicians and designate a physician suggested by the injured employee or by the commission itself, and in such case the expense thereof shall be borne by the employer * * *.

"The pecuniary liability of the employer for the treatment, articles, and supplies herein required shall be limited to such charges therefor as prevail in the same community for similar treatment, articles, and supplies furnished to injured persons of a like standard of living, * * *." (Italics supplied.)

The statute thus indicates two separate situations in which a change of physicians furnished an employe under the act is permitted at the expense of the employer. They are (1) where the employer or his physician is unable or refuses to furnish the employe with such medical, surgical, and hospital treatment as may reasonably be required to cure and relieve the effects of the injury; and (2) at any time where the employe or employer requests such a change, in which event the commission may, in its discretion, direct a change to a physician suggested by the injured employe or by the commission.

In the first situation, the statute does not specify that as a prerequisite to such a change an order therefor be procured from the

commission. The inability or refusal of an employer or his physician to furnish the needed medical, surgical, or hospital treatment certainly would justify an employe in making an immediate change without jeopardizing his health or condition by even the slight delay involved in awaiting authorization therefor by the commission. In the second situation, the statute contemplates that at the request of either employer or employe a change of physicians may be authorized by the commission in its discretion, even though the physicians furnished by the employer are providing proper medical treatment, since other factors, such as the convenience of parties, the location of required hospital facilities or medical equipment, the need for further specialized treatment, or many like considerations, may be deemed sufficient to authorize a change. The only limitation prescribed in such an event is that if a change be authorized it be to a physician suggested by the employe or named by the commission.

■ Our previous decisions lend support to this viewpoint. In Carmody v. City of St. Paul, 207 Minn. 419, 291 N. W. 895, involving this statute, we held, notwithstanding the provision therein that "The employer shall furnish such medical * * * treatment * * * as may reasonably be required," that an employe nevertheless, in the initial instance, might select his own physician. In Morrell v. City of Austin, 208 Minn. 132, 137, 138, 293 N. W. 144, 147, 142 A. L. R. 1199, it was held, where physicians furnished by the employer for a period of more than 16 months "had fumbled and delayed the discovery of relator's real needs and requirements and had failed to furnish the professional aid really owed to relator," that "the statutory equivalent of 'inability or refusal *seasonably*' to furnish and provide that which the statute requires" had been established. Based thereon, we upheld the employe's right to change physicians at his employer's expense, even though the commission had failed to grant or act upon his request for such procedure. In O'Neil v. Oliver I. Min. Co. 225 Minn. 472, 32 N. W. (2d) 71, where an injured employe was receiving proper treatment from his employer's physicians and his employer had refused his

request for a change therefrom, on the strength of his consultation with an attorney for the commission who made an appointment for him with the new physician, we upheld the employe's right to recover for the additional medical expenses thus incurred notwithstanding the fact that he had obtained no formal order from the commission authorizing the change. Therein other additional medical expenses incurred by the employe prior to his conference with the commission's attorney were disallowed, since the evidence presented did not establish that the employer's physicians were unable or had refused to give the employe proper treatment.

■ Here, the evidence establishing inability or refusal to furnish proper diagnosis and adequate treatment of employe's disability is more substantial than that submitted in the Morrell case. Here, notwithstanding repeated visits by employe to his employer's physicians for a period of over 21 months, no proper diagnosis of his disability had been made and no adequate medical or surgical treatment provided therefor. The evidence established that a spinogram X ray is required for proper diagnosis of a disc rupture, but no spinogram was suggested by employer's physicians. As far as the record indicates, there was never even a suspicion on the part of any of them that a disc rupture was the basis of employe's disability.

Dr. Snyker, on the other hand, on employe's first call, suspected a spinal injury, while the diagnosis subsequently made by Dr. Smith after the spinogram X ray quickly established employe's need for immediate surgery, which was furnished and which shortly effected his cure.

■ Employer asserts, however, that after employe's first examination at Shipman Hospital further medical and hospital services awaited him and that his neglect to avail himself thereof was sufficient cause for the inability of employer's physicians to diagnose his injuries and furnish him with proper treatment. The record establishes that employe did return to Shipman Hospital on numerous occasions. He testified: "I was in there so often I could not remember, sometimes one doctor would be in and the other one would be out, and I would have to change doctors all the time";

that on one such occasion the doctor "felt my back and taped me up," and that "that is about all there was to it." These repeated calls should have given employer's physicians adequate opportunity for a correct diagnosis of employe's difficulties and proper treatment or surgery for the relief thereof.

We hold that the evidence outlined was sufficient to establish the inability and refusal of employer's physicians to furnish the required treatment and to justify the employe in seeking further medical attention from physicians and surgeons of his own choice; and that under such circumstances an order of the commission authorizing the change was not required. It follows that the findings and award of the industrial commission must be sustained.

Affirmed.